Leona Anderson v. Commissioner.
Anderson v. Commissioner
Docket No. 22222.
United States Tax Court
1952 Tax Ct. Memo LEXIS 252; 11 T.C.M. (CCH) 384; T.C.M. (RIA) 52107; April 18, 1952
*252 Held: 1. Petitioner has failed to establish that she sustained a deductible loss in any amount on the sale in the taxable year 1945 of six commercial motion picture photoplays produced in 1921. 2. Petitioner is entitled to a deduction of the sum of $400 as ordinary and necessary expenses paid in the taxable year 1945 in carrying on her business of radio broadcasting. Benjamin Mahler, Esq., for the petitioner. Joseph F. Rogers, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion LEMIRE, Judge: This proceeding involves a deficiency in the income tax of petitioner for the calendar year 1945 in the amount of $2,261.73. The issues are (1) whether petitioner sustained a deductible loss on the sale *253 in 1945 of six commercial motion picture photoplays and the amount thereof; and (2) whether the petitioner is entitled to a deduction of the sum of $400 as ordinary and necessary expenses paid in 1945 in carrying on her business of radio broadcasting. Petitioner by amended petition assigned as error the disallowance of a deduction in the amount of $2,500 as a loss sustained on the theft of a pearl and diamond bracelet. This issue was abandoned by petitioner at the trial. The case was submitted on oral testimony, depositions and exhibits. Findings of Fact Petitioner, now residing in New York, New York, was a resident of Los Angeles, California, during the taxable year 1945. Her income tax return for the year 1945 was filed with the collector of internal revenue for the sixth district of California. Petitioner is a sister of G. M. Anderson, a pioneer in the moving picture industry. For the past 40 years Anderson has been associated with the various branches of the industry. In about 1921 the petitioner caused a corporation to be formed for the purposes of producing silent motion pictures featuring Stan Laurel as a comedian. Petitioner invested approximately $12,000 for the *254 production of six commercial photoplays under the direction of Anderson. Among the moving pictures produced was a three reel film with the title "Mud and Sand," a comedy burlesque on the then outstanding motion picture called "Blood and Sand" featuring Rudolph Valentino. On October 24, 1921, a certificate of incorporation of Amalgamated Producing Co., Inc., was filed with the Secretary of State of the State of New York. That corporation was dissolved by proclamation of the Secretary of State on December 16, 1929, pursuant to section 203-A of the Tax Law of the State of New York, relating to delinquent corporations. On June 1, 1922, an agreement was executed between "AMALGAMATED PRODUCING CORPORATION," called the "PRODUCER," and "METRO PICTURES CORPORATION," called the "DISTRIBUTOR," both being corporations duly organized and existing under and by virtue of the laws of the State of New York. This agreement was signed by "AMALGAMATED PRODUCING CORPORATION, By Leona Anderson Rosenstirn, Pres.," which is the married name of petitioner. The agreement bears the imprint of the corporate seals of the respective parties. The agreement recites that the Producer has manufactured six motion *255 picture photoplays known as Stan Laurel comedies, featuring "STAN LAUREL," and has the sole and exclusive right to distribute the same throughout the world; and that it is the desire of the parties that the distribution of the aforesaid motion picture photoplays be made through the Distributor. The agreement, inter alia, contains the following covenants: "1 - The Producer * * *
"(e) Grants to the Distributor the sole and exclusive right, license and privilege, under the Producer's copyright, and otherwise, to present each of said motion picture photo-plays and to distribute positive prints thereof throughout the world for a period of eight (8) years from their respective release dates in the various countries throughout the world; * * *
"(g) Hereby warrants that it is the owner of each of said motion picture photo-plays herein contracted for, and has the exclusive right to distribute the same and to authorize the distribution thereof throughout the world; "(h) Agrees to procure a United States copyright for each of said motion picture photo-plays, * * *
"2 - The Distributor * * *
"(g) Agrees to pay to the Producer, for the right to use, distribute, *256 exhibit and license others to exhibit the aforesaid motion picture photo-plays and positive prints thereof as follows: "A sum equal to sixty per cent (60%) of the gross receipts received by the Distributor and its Exchanges from the exhibition of each and every positive print of each of said motion picture photo-plays throughout the United States, and a sum equal to sixty per cent (60%) of the gross receipts received by it from the distribution of each of said motion picture photo-plays throughout the other countries of the world; "(h) Agrees to repay itself from the aforesaid sixty per cent (60%) of the gross receipts received from the exhibition or sale of territorial rights of each of said motion picture photo-plays throughout the United States, and from sixty per cent (60%) of the gross receipts received from sub-agents and from the exhibition and sale of territorial franchises of each of said motion picture photo-plays throughout the rest of the world, any and all moneys advanced to or incurred on account of the Producer in accordance with the provisions hereof, which sums the Producer hereby agrees the Distributor may withdraw and repay itself for such advances; "(i) Agrees *257 that after it has repaid itself the moneys so advanced as aforesaid from the sixty per cent (60%) of the gross receipts due as aforesaid to the Producer, retaining at the same time forty per cent (40%) of said receipts as compensation for the distribution of said motion picture photo-plays, it shall pay to the Producer from the gross receipts received as aforesaid sixty per cent (60%) of such gross receipts, retaining for itself the remaining forty per cent (40%) of such gross receipts as aforesaid as compensation for its services as Distributor; "(j) Agrees to keep full, true and accurate books of account relating to the distribution of said motion picture photoplays, the bookings thereof and the rentals and gross receipts therefrom and to give to the Producer or its accredited representative or any certified accountant employed by the Producer full access at all reasonable times to all the books, accounts, records, papers and vouchers of the Distributor and its exchanges pertaining to the bookings, rentals, franchises and receipts of the aforesaid motion picture photo-plays; * * *
"(n) Agrees to cause the first of said motion picture photo-plays or the positive reproductions *258 thereof to be released in the United States on or about the 1st of September, 1922, and the remaining nine (9) at approximately monthly intervals thereafter, it being understood and agreed that the Distributor shall determine the order in which said motion picture photo-plays shall be released and distributed; * * *
"4 - It is understood and agreed that the title to and the ownership of the aforesaid motion picture photo-plays, the negatives and each of the positive prints thereof shall at all times be and remain in the Producer, but shall be qualified and subordinate to the right of possession of the Distributor and the right of recoupment of advances as herein provided, that is, the negatives and prints of each of said motion picture photo-plays shall not be subject to process by creditors or assignees of the Producer until the expiration of the license herein provided for or the renewal thereof, if any." * * *
A corporation income and profits tax return covering the calendar year 1921 was filed in the name "AMALGAMATED PRODUCING COMPANY, LONGACRE HOTEL, NEW YORK CITY." The return stated, "THIS CORPORATION HAD NO TRANSACTIONS FOR THE YEAR 1921 - THEREFORE - NO TAX. *259 " It was signed by Fred Church, as treasurer. A corporation income tax return for the calendar year 1922 was filed under the name "AMALGAMATED PRODUCING COMPANY, 323 Mills Building, San Francisco, California." The return gives the date of incorporation as 1921 and the state of incorporation as California. The return states, "The pictures produced by this corporation have not been released. Therefore, all expenditures made are for production and are capital charges." The return is signed by Leona Anderson, president, and Fred Church, as treasurer. A corporation income tax return for 1923 was filed on June 14, 1924, in the name of "AMALGAMATED PRODUCING COMPANY, 323 MILLS BUILDING, SAN FRANCISCO, CALIFORNIA." This return was signed by Leona Anderson Rosenstirn, president, and M. Adler, treasurer. This return showed royalties received in the sum of $58,575.04, a loss of $80,000 from the sale of six films produced in 1921, and deductions of $7,860 interest, $8,162.10 for publicity, advertising, etc., and $2,000 legal, and reported a net loss of $39,447.06. On March 25, 1925, a corporation income tax return was filed for the year 1924 in the first district of California in the same *260 name and with the same signatures as the previous 1923 return. The return showed royalties received in the sum of $22,621.21, deductions of $2,352.89, and a carry-over of a net loss of $39,447.06 from the previous year. No claim for depreciation or amortization was made on any of the aforementioned returns. The film "Mud and Sand" was an ordinary commercial film. It was released by the Metro Pictures Corporation about October 1922. The reasonable economic life of a motion picture film is usually two years. It is the general practice with the large motion picture producers to amortize ordinary commercial motion picture photoplays over a two year period. In the fall of 1927 the first sound moving pictures were made. By 1929 nearly all theaters were equipped with sound and thereafter there was practically no market for silent motion picture plays. A few outstanding silent photoplays were equipped with sound tracks. The photoplays acquired by Metro Pictures Corporation from the Amalgamated Producing Corporation were not so equipped. In 1945 petitioner received from the Metro Pictures Corporation the six films which had been transferred to it under the agreement of June 1, 1922. The *261 films had deteriorated somewhat while in the Metro Company's vaults. Petitioner had the films restored at the Her Laboratories at a cost of $400. On July 20, 1945, petitioner sold all the right, title, copyright and interest in the six motion picture photoplay positives and negatives to the 8 & 16 M.M. Film Corporation, 630 Ninth Avenue, New York, New York, for a consideration of $600. Petitioner paid a commission of $100. The sale covered the following films starring Stan Laurel: "Mud and Sand," "The Pest," "When Nights Were Cold," "Week End Party," "The Egg," and "The Handy Man." On her 1945 individual income tax return the following deductions were claimed: SCHEDULE C - BUSINESS OR PROFESSION
Stanley Laurel Pictures
Cost of Production
$12,000.00
Travel to New York
750.00
Negative & Showing
Pictures
450.00
Insurance
50.00
Commission
100.00
$13,350.00
Amount Realized
600.00
Net Loss
$12,750.00 In determining the deficiency the respondent disallowed the loss claimed. The petitioner has failed to establish that she sustained a deductible loss on the sale of the six motion picture photoplays in the taxable year 1945 in any amount. During *262 the taxable year 1945 the petitioner was a member of the AFRA and engaged in radio broadcasting for the purpose of earning income. In connection with her broadcasting she paid for the preparation of the script $200, for the musical arrangements $200, and for making records of the broadcast the sum of $75. Petitioner realized income in 1945 in the amount of $75 from her radio broadcasting. In her 1945 income tax return petitioner claimed a deduction in the amount of $400 in connection with her radio broadcasting. The respondent disallowed the deduction. The expenditures in the amount of $475 made by petitioner in 1945 in connection with her radio broadcasting constituted ordinary and necessary expenses paid in carrying on petitioner's trade or business. Petitioner is entitled to deduct in 1945 the difference between the expenses of $475 and the sum of $75 received as income or the net amount of $400. Opinion The first issue presents the question whether the petitioner sustained a loss on the sale of six silent motion photoplays in the taxable year 1945. The petitioner contends that in about 1921 she invested approximately $12,000 for the production of six moving pictures *263 starring Stan Laurel, which were directed and produced by her brother, G. M. Anderson, a pioneer in the moving picture industry. The petitioner kept no records or had no documentary evidence to support her oral testimony. After the lapse of so extended a period since the occurrence of the material facts, it is not at all surprising that petitioner's recollection was faulty, her testimony confused and seemingly contradictory. It is obvious, from this record, that after petitioner's initial investment in 1921, all the subsequent details were handled by her brother and others with little understanding upon the part of the petitioner of what actually transpired. Furthermore, we think that some of the documentary evidence offered by the respondent only adds further confusion. For instance, the respondent offered in evidence a certificate of incorporation of Amalgamated Producing Co. Inc., under the laws of the State of New York, together with a certificate of the Secretary of State certifying that that corporation was dissolved on December 16, 1929, by proclamation pursuant to section 203-A of the Tax Law of New York requiring the dissolution of certain delinquent corporations. The *264 respondent also offered in evidence certain federal income tax returns filed in 1922, 1923 and 1924 under the name of Amalgamated Producing Company, 323 Mills Building, San Francisco, California. In one of such returns it is stated that the corporation was organized under the laws of the State of California. While these returns were signed by the petitioner, as president, she testified they related to a different company and did not involve the films on which the claimed loss is predicated. The respondent also offered in evidence an agreement dated June 1, 1922, between the Amalgamated Producing Corporation and Metro Pictures Corporation in which it is stated that both corporations were organized under the laws of the State of New York. Petitioner signed that agreement and it bears the seal "AMALGAMATED PRODUCING CORP. OF NEW YORK." Petitioner concedes that the agreement of June 1, 1922, pertains to the films here in question. We are convinced that the Amalgamated Producing Corporation is a corporation distinct from the one incorporated and dissolved in 1929 under the name Amalgamated Producing Co. Inc. But we are not convinced that the federal income tax returns filed in California *265 under the name Amalgamated Producing Company were not intended to be the returns of the Amalgamated Producing Corporation, which executed the distribution agreement of June 1, 1922. This record contains no data with respect to the incorporation or dissolution of the Amalgamated Producing Corporation. Such information was available in the office of the Secretary of State of the State of New York. Since petitioner concedes there was such a corporation, it was incumbent upon her to supply such proof. The agreement of June 1, 1922, between the Amalgamated Producing Corporation and the Metro Pictures Corporation covered a period of eight years and would have expired on June 1, 1930. No distribution of the films covered by that agreement was made after that date. Furthermore, the evidence shows that petitioner in 1945 received those films from the vaults of Metro Pictures Corporation in whose custody they had been since the agreement of June 1, 1922. We think it is a reasonable inference that if Amalgamated Producing Corporation was not formally dissolved at the expiration of the agreement of June 1, 1922, it was dissolved by proclamation of the Secretary of State pursuant to section *266 203-A of the Tax Law of the State of New York as a delinquent corporation sometime not later than 1930. On brief the petitioner contends that she owned all the stock of the Amalgamated Producing Corporation and received the films in question as a distribution in kind in complete liquidation of such corporation. Upon the basis of this record we think that is a reasonable assumption. As the agreement of June 1, 1922, discloses that Amalgamated Producing Corporation was the original owner of the films, we think it is also reasonable to infer that the distribution in kind took place not later than June 1, 1930. The fact that petitioner did not actually take possession at that time is immaterial since she had the legal right to them although she did not demand them until 1945. Thus, under sections 112 (a) and 115 (c) of the Internal Revenue Code, when petitioner received the films as a distribution in kind in complete liquidation of the corporation she then had a taxable gain or loss of the difference between her investment in the stock of the corporation and the fair market value of the property received. Coxe v. Handy, 103 Fed. (2d) 873; T. T. Word Supply Co., 41 B.T.A. 965, 983.
*267 Petitioner offered no evidence of the fair market value of the films at the time received as a distribution in liquidation. However, the testimony of qualified and disinterested expert witnesses is to the effect that silent motion pictures, such as here involved, had no commercial value after a period of two or three years after their first release, and in any event no commercial value after the advent of sound pictures in 1928 or 1929. It is our opinion that when the petitioner received the films as a distribution in complete liquidation they had no fair market value, and petitioner's basis for a subsequent sale was zero. On this record we hold that petitioner has failed to establish that she sustained a deductible loss in connection with the sale in 1945 of the motion picture films here involved and on this issue the determination of the respondent is sustained. The second issue involves the question whether petitioner is entitled to a deduction in 1945 of the sum of $400 in connection with her business of radio broadcasting. Petitioner contends that she was a member of AFRA and engaged in radio broadcasting for the purpose of earning income. She reported income from that source *268 of $75 and claimed deductions totalling $475 or a net loss of $400. The respondent concedes that she is entitled to a deduction of $200. While the evidence on this issue is rather meager, we think it shows that the expenditures of $475 were incurred in 1945 in carrying on petitioner's trade or business, and that she is entitled to a deduction of the sum of $400 as ordinary and necessary business expenses under section 23 (a) (1) (A) of the Internal Revenue Code. Decision will be entered under Rule 50.