Fernando Faura and Rita Faura, Petitioners *v.*
Commissioner of Internal Revenue, Respondent

Docket No. 10041–77.    Filed February 19, 1980.

Fernando Faura, pro se.
*Michael R. Morris,* for the respondent.

Dawson, *Judge:* Respondent determined a deficiency of $1,946 in petitioners' Federal income tax for the year 1974. Concessions have been made by the parties. The only issue presented for decision is whether petitioner Fernando Faura, an author, may currently deduct under section 162[1] certain expenses paid or incurred while writing two books, or whether such expenses should be capitalized pursuant to section 263.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by this reference.

Fernando Faura (hereinafter petitioner) and Rita Faura maintained their legal residence in San Fernando, Calif., at the time they filed their petition in this case. Petitioner and his wife timely filed their joint Federal income tax return for the taxable year 1974.

Petitioner was in the trade or business of being an author in 1974 when he paid or incurred the following expenses in connection with the writing of two manuscripts:

*Office expenses*

| | | |
|---|---|---|
| (1) | Office rent ................................... | $672.00 |
| (2) | Mail ............................................. | 20.00 |
| (3) | Gifts[1] ......................................... | 30.00 |
| (4) | Printing ....................................... | 58.95 |

---

[1]All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise indicated.

| | | |
|---|---|---:|
| (5) | Telephone | 180.00 |
| (6) | Supplies | 50.00 |
| (7) | Answering service | 25.00 |
| (8) | Post office box rental | 18.00 |
| (9) | Legal fees | 40.00 |
| (10) | Subscriptions | 40.00 |
| (11) | Water and power | 57.00 |
| (12) | Gas | 55.00 |
| (13) | Architectural | 125.00 |
| (14) | Research | 38.95 |
| (15) | Travel[1] | 571.38 |
| (16) | Miscellaneous office expense | 40.00 |
| (17) | Entertainment[1] | 1,000.00 |
| | Total office expenses | 3,021.28 |

### Transportation expenses

| | | |
|---|---|---:|
| (1) | Automobile repair expenses | $231.69 |
| (2) | Gasoline | 721.76 |
| (3) | Depreciation autos | 780.00 |
| (4) | Automobile insurance | 239.59 |
| | Total transportation expenses | 1,973.04 |
| | Total expenses | 4,994.32 |

[1] Respondent has not suggested in the stipulations, at trial, or on brief any applicability of sec. 274 to disallow the expenditures for gifts, travel, and entertainment. Accordingly, we treat any question regarding substantiation of these expenses as abandoned by respondent.

Petitioner has realized no income from the sale of his writings. He had not sold the manuscripts as of the date of the trial, but he was still actively marketing his unprinted books.

Petitioner claimed a deduction for his expenditures in writing the two books as ordinary and necessary business expenses for 1974. Respondent disallowed the claimed deduction on the ground that such costs were capital expenditures.

### OPINION

Section 162 provides there shall be allowed as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 1.162–6, Income Tax Regs., provides that an individual in a profession may claim as deductions:

the cost of supplies used by him in the practice of his profession, expenses paid

or accrued in the operation and repair of an automobile used in making professional calls, dues to professional societies and subscriptions to professional journals, the rent paid or accrued for office rooms, the cost of the fuel, light, water, telephone, etc., used in such offices, and the hire of office assistants. Amounts currently paid or accrued for books, furniture, and professional instruments and equipment, the useful life of which is short, may be deducted.

Section 263, which takes precedence over section 162,[2] provides that no deduction shall be allowed for any amount paid out for permanent improvements or betterments made to increase the value of any property. Section 1.263(a)–2, Income Tax Regs., includes as examples of capital expenditures:

(a) The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year.

(b) Amounts expended for securing a copyright and plates, which remain the property of the person making the payments.

Section 461(a) provides that "the amount of any deduction * * * shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Section 1.461–1(a)(1), Income Taxs Regs., provides:

Under the cash receipts and disbursements method of accounting, amounts representing allowable deductions shall, as a general rule, be taken into account for the taxable year in which paid. * * * [If, however] an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made. * * *

Respondent contends that expenses incurred by an author in producing a book constitute nondeductible capital expenditures because they result in the creation of an asset having a useful life extending beyond the taxable year. Under this view, the costs attributable to writing a book establish the author's basis under section 1012, and are available for future depreciation or amortization under section 167(a). Such a view, respondent argues, derives its support from *Commissioner v. Idaho Power Co.*, 418 U.S. 1 (1974).

In *Idaho Power*, a public utility company claimed depreciation deductions under section 167(a) on all its transportation equip-

---

[2]*Commissioner v. Idaho Power Co.*, 418 U.S. 1, 17 (1974).

ment, cars, and trucks, including that portion attributable to its use in constructing capital facilities. The Supreme Court, affirming an opinion of this Court, held that the equipment depreciation allocable to the taxpayer's construction of capital facilities must be capitalized under section 263(a)(1). It said (418 U.S. at 16):

The purpose of §263 is to reflect the basic principle that a capital expenditure may not be deducted from current income. It serves to prevent a taxpayer from utilizing currently a deduction properly attributable, through amortization, to later tax years when the capital asset becomes income producing. * * *

On the basis of *Idaho Power*, the respondent argues that the books written by petitioner have a productive life extending beyond the year in which the expenses are incurred, and thus the expenditures cannot be deducted currently but must be allocated, through depreciation deductions in future years, over the periods benefited by the asset.

Whether an expenditure may be currently deducted as an ordinary and necessary business expense or must be charged to capital has often presented a perplexing question to be decided upon the facts and circumstances of the particular case. As the Supreme Court observed in *Welch v. Helvering,* 290 U.S. 111, 115 (1933): "One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle."

The issue of capitalization of a writer's expenses, or for that matter any producing artist's expenses, has had a long and varied history. The first case appears to be *Doggett v. Burnett*, 65 F.2d 191 (D.C. Cir. 1933). There the taxpayer arranged for the publication of religious books and, in doing so, expended some $38,000 for their printing, advertising, and sale. The expenses also included a salary for an assistant, travel costs, and advertising in newspapers and magazines. The Court of Appeals held that such expenditures were deductible.

In *May v. Commissioner*, 39 B.T.A. 946 (1939), the taxpayer was employed by Columbia Pictures and the Fox Film Corp. to serve as a motion picture director and as a collaborator and writer of motion picture scripts.[3] We held that certain amounts

---

[3]Although the taxpayer in *May* was an employee-writer, in *Delmar v. Commissioner*, a

expended for entertainment, automobile operating costs, telephone, telegraph, and cable charges were deductible as ordinary and necessary expenses in his trade or business of being a motion picture director and writer.

In *Shumlin v. Commissioner*, 16 T.C. 407 (1951), the taxpayer, a theatrical producer, had produced 25 stage plays during a period of about 20 years. His activities consisted of choosing plays for production, bringing together playwrights, actors, and other professional participants, and supervising financial and business arrangements. Rather than requiring capitalization into particular plays of his cash outlays for travel, entertainment, and other business expenses, this Court held that such expenditures were deductible.[4]

In *Kluckhohn v. Commissioner*, 18 T.C. 892 (1952), the taxpayer was a newspaper correspondent and writer. His wife traveled to Australia and gathered material which he used in writing a book and an article. We allowed as a deduction a reasonable portion of the total amount expended by the wife in connection with the trip, i.e., that part attributable to the collection of information for use by the taxpayer in his business of writing.

The second appellate court opinion in the area was *Brooks v. Commissioner*, 274 F.2d 96 (9th Cir. 1959), in which a freelance research scientist incurred certain travel expenses in the course of her research. Although she did not expect to realize a present profit from the publication of her research, she argued that such expenditures were necessary to maintain her professional standing in order to be eligible for prospective salaried research appointments. The Commissioner contended that such expenses were not profit motivated and were therefore not ordinary and

---

Memorandum Opinion of this Court dated Apr. 5, 1938 (7 P-H Memo B.T.A. par. 38,155), the taxpayers were free-lance writers who incurred automobile, telephone, traveling, and kindred expenses in connection with their business of writing magazine and motion picture stories. In *Delmar*, we held that such expenses were deductible as ordinary and necessary business expenses. See also *Sandrich v. Commissioner*, 5 T.C.M. 234, Supplemental Opinion, 5 T.C.M. 570, 15 P-H Memo T.C. par. 46,082, Supplemental Opinion, 15 P-H Memo T.C. par. 46,144 (1946), where the taxpayer, a motion picture writer, producer, and director, was permitted a current deduction for story preparation expenses which consisted of salary he paid to another writer and expenditures arising from the business use of his home.

[4]See also *Anderson v. Commissioner*, 11 T.C.M. 384, 21 P-H Memo T.C. par. 52,107 (1952), where the taxpayer was in the trade or business of radio broadcasting and spent sums of money for preparing a script, musical arrangements, and recording a radio broadcast. We held the expenditures, including those for the preparation of the script, constituted ordinary and necessary expenses paid in carrying on the taxpayer's trade or business.

necessary business expenses. He also argued that the taxpayer's travel expenses resembled a capital expenditure—that what she was in fact doing was equivalent to getting further education in order to increase her future profit potential rather than presently engaging in a profitable enterprise. The Court of Appeals for the Ninth Circuit, where an appeal would lie in this case, dismissed both of respondent's contentions and held the expenses were incurred in good faith for the purpose of making a profit and to retain her position with a university, and were therefore deductible.

Four years later, respondent agreed in part with the *Brooks* decision in Rev. Rul. 63–275, 1963–2 C.B. 85, which approved the deductibility of research expenses, including traveling expenses, incurred by college and university professors in their capacity as educators. See also B. Wolfman, "Professors and the 'Ordinary and Necessary' Business Expense," 112 U. Pa. L. Rev. 1089 (1964). The revenue ruling makes the assumption that "where the research is undertaken with a view to scholarly publication, the expenses for such purposes can not usually be considered to have been incurred for the purpose of producing a specific income-producing asset." The ruling permits stenographic and other expenses incurred in preparing a manuscript for the purpose of teaching, lecturing, or writing and publishing in the professor's capacity as an academic and without expectation of profit apart from salary.

While the issue here concerns the expenses of an artist as a writer, a similar case addressed the expenses of an artist as a sculptor.[5] In *Rood v. United States*, 184 F. Supp. 791 (D. Minn. 1960), the Government contended that sculpturing did not constitute a trade or business, thus precluding the deductibility of any expenses.[6] The District Court, observing that the business

---

[5]See also *Whitman v. Commissioner*, T.C. Memo. 1960–88, where the taxpayer, a freelance illustrator of children's books, was permitted business deductions for rent, telephone, utilities, maid service, office equipment and supplies, entertainment, hotel and travel, legal services, and miscellaneous expenses; *Bischoff v. Commissioner*, T.C. Memo. 1966–102, where the taxpayer, an artist making drawings, sketches, and paintings for television commercials, was permitted business deductions for art supplies, art books, studio maintenance, telephone, transportation, gifts, rent, dues, subscriptions, and entertainment; and *Adams v. Commissioner*, T.C. Memo. 1966–242, where the taxpayer, a painter, was permitted deductions for the operation of his art studio.

[6]The litigation positions of the Commissioner present a true "Catch-22" to the producing but unprofitable artist: If he is not a trade or business under sec. 162, then none of the expenses are deductible except as limited by sec. 183. If he is in a trade or business, then none of the expenses attributable to the artwork are deductible currently by reason of sec. 263.

of sculpturing carried on by the taxpayers included not only the actual creation of the sculptures, but also teaching, operating a gallery, and writing, held that the expenses were deductible under section 162.

The Commissioner reiterated his position on capitalization in Rev. Rul. 68–194, 1968–1 C.B. 87. The revenue ruling concerned an author, who reported income on the cash receipts and disbursements method of accounting and incurred expenses for secretarial help, art work, supplies, postage, and travel in producing and copyrighting a manuscript of literary composition but who was not in the trade or business of writing, even though the writing and publishing of the book was a transaction entered into for profit. Bootstrapping himself by Rev. Rul. 234, 1953–2 C.B. 29, the Commissioner indicated that such expenses were not deductible under section 212[7] but rather were capital expenditures under section 263, the total of which was the taxpayer's basis of the property. The ruling also described accounting procedures for amortizing the defined cost basis over the actual sales of the book.

The Commissioner's position was again subjected to the judicial crucible in *Stern v. United States*, an unreported case (C.D. Cal. 1971, 27 AFTR 2d 71–1148, 71–1 USTC par. 9375). In that case, the taxpayer, who had been engaged in the field of writing for 45 years and had authored numerous newspaper stories, magazine articles, and screen plays, incurred travel expenses while researching, writing, and arranging material for a portion of his book prepared and published in 1965. The District Court, noting that the expenses were not for securing a copyright and plates which remain the property of the person making the payments (sec. 1.263(a)–2(b), Income Tax Regs.), held that the expenditures were deductible under section 162 as ordinary and necessary expenses in carrying on the taxpayer's trade or business of writing.

Not surprisingly, the Commissioner in Rev. Rul. 73–395, 1973–2 C.B. 87, published his rejoinder to the *Stern* opinion by declaring that it would not be followed. It was explained that he did not recommend appeal of that case because of a stipulation to the effect that "if the taxpayer was determined to be in the

---

[7]Sec. 212(1) provides for the deduction of all ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income. It is parallel to sec. 162 but does not have the requirement of carrying on a trade or business.

business of being a writer, the traveling expenses in question were ordinary and necessary."

Revenue Ruling 73–395, *supra*, also set out in detail the Commissioner's views that a taxpayer, using the accrual method of accounting, may not deduct in the year incurred all of its expenditures pertaining to the writing, editing, design, and artwork for textbooks for visual teaching portfolios. The Commissioner reasoned that expenditures which are directly attributable to producing and copyrighting[8] a manuscript of literary composition result in the creation of an asset having a useful life that extends substantially beyond the close of the taxable year, and thus by reason of section 1.461–1(a)(2), Income Tax Regs., are capital in nature. Moreover, respondent's position in the ruling is that since such expenditures must be capitalized under section 263 and depreciated under section 167(a), they are not inventoriable within the meaning of section 471.[9] The ruling also noted that section 1.174–2(a)(1), Income Tax Regs., specifi-

---

[8]Almost simultaneously with the Tax Reform Act of 1976, Congress substantially revised the copyright laws by Pub. L. 94–553, 90 Stat. 2541 (Oct. 19, 1976). The new Copyright Law, 17 U.S.C. sec. 101 et seq. (1977), took effect Jan. 1, 1978. After that date, all rights within the general scope of copyright as specified in 17 U.S.C. sec. 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified in 17 U.S.C. secs. 102 and 103 (which includes literary works), whether created before or after Jan. 1, 1978, and *whether published or unpublished*, are governed exclusively by the Federal Copyright Law. 17 U.S.C. sec. 301 (1977). Literary works while unpublished are subject to protection under the new Copyright Law. 17 U.S.C. sec. 104(a) (1977). Under the previous laws enacted in 1909 and 1947, the only literary works registrable in unpublished form were dramas, lectures, and seminar works prepared for oral delivery. Under the 1976 Copyright Law, novels, short stories, and poems are covered. Under the new law, copyright in a work created on or after Jan. 1, 1978, exists from its creation (not publication). 17 U.S.C. sec. 302 (1977). See generally Law and the Writer (K. Polking & L. Meranus eds. 1978).

[9]SEC. 471. GENERAL RULE FOR INVENTORIES.

Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Sec. 1.471–1, Income Tax Regs., provides in part:

"In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, * * * "

On brief, respondent contends that there is no meaningful distinction in the present context between a professional author who writes books for profit and a taxpayer who manufactures a product that he holds for sale in the ordinary course of his trade or business. Citing sec. 471 of the Code and secs. 1.471–1 and 1.471–11 of the regulations, respondent stresses that the revenue laws do not permit a manufacturer to deduct the expenses paid or incurred in producing that product under sec. 162. We simply observe that sec. 1.471–11(c)(2)(ii), Income Tax Regs., does not require inclusion into inventoriable costs of many of the types of expenditures at issue in this case, for example, marketing expenses, advertising expenses, selling expenses, other distribution expenses, research

cally excludes expenditures for research in connection with literary, historical, and similar projects from the option under section 174 to deduct, currently, research expenditures which would otherwise be chargeable to the capital account.

Shortly thereafter, Congress expressed its dissatisfaction with Rev. Rul. 73–395. In H. Rept. 94–658, 94th Cong., 1st Sess. 337 (1975), 1976–3 C.B. (Vol. 2) 1029, the Ways and Means Committee, understanding that historically tax accounting practices in the publishing industry had varied greatly and that no standard procedures had been developed, was concerned that the retroactive application of Rev. Rul. 73–395 would adversely affect practices consistently followed by many taxpayers for years. The House committee sought to make nugatory the effect of the revenue ruling by allowing taxpayers to treat their prepublication expenditures in the manner in which they had been applied consistently in the past by the taxpayer until the issuance of Treasury regulations to establish a uniform treatment of such expenditures for the entire publishing industry.

H. Rept. 94–658, *supra,* concerned itself exclusively with "publishers," and not "writers." On April 27, 1976, Senator Ribicoff proposed an amendment to H.R. 10612 which sought to provide for writers the same entitlement to treat research and other prepublication expenses as deductions against current income as the proposed bill permitted for publishers.[10]

---

expenses, and general and administrative expenses incident to and necessary for the taxpayer's activities as a whole.

[10]                                     Amendment No. 1613

MR. RIBICOFF: Mr. President, I send to the desk an amendment to be proposed to H.R. 10612, entitled "The Tax Reform Act of 1975" which has passed the House and is pending before the Finance Committee.

The amendment would suspend the application of Revenue Ruling 73–395 so as to permit authors and publishers to currently deduct "prepublication expenditures." Section 1306 of H.R. 10612 extends this relief only to publishers. My amendment recognizes that authors are just as much entitled to treat research and other prepublication expenses as a deduction against current income as are publishers. It therefore relieves both authors and publishers from the effects of Revenue Ruling 73–395, a ruling which treats prepublication expenditures as capital expenditures to be depreciated over the life of the asset created.

What makes Revenue Ruling 73–395 all the more unfair is the fact that while it requires expenditures to be depreciated, section 1221(3) of the Code prohibits authors from treating their output as "capital assets."

In other words, without the amendment I am proposing authors will be taxed at the higher "ordinary income" rates while they will only be able to depreciate expenses. This is patently unfair.

Lest there be some concern that with passage of my amendment so-called vanity press authors will reap unwarranted tax benefits, the language of the amendment takes care of this situation. The deduction for prepublication expenditures would only be available to a taxpayer "in connection with

S. Rept. 94–938, 94th Cong., 2d Sess. 403–405 (1976), 1976–3 C.B. (Vol. 3) 441–443, reiterated the substance of H. Rept. 94–658, *supra*, and specifically addressed the issue of authors:

> The committee believes that the Service's position to disallow any deductions for authors' prepublication expenses and its decision not to follow the ruling in *Stern v. United States* results in inequitable treatment for taxpayers who are professional authors engaged in the business of writing. The committee believes authors should be allowed to deduct as business expenses the essential, reasonable costs of earning income from their writing. Furthermore, the committee believes that it would be discriminatory to allow publishers to deduct expenses which authors must capitalize. Therefore, the committee believes it appropriate to provide relief from Revenue Ruling 73–395 to authors, as well as to publishers.

When the bill went to conference, the conference agreement followed the House bill with necessary technical changes. S. Rept. 94–1236, 94th Cong., 2d Sess. (1976), 1976–3 C.B. (Vol. 3) 906.

The final provision which became section 2119[11] of the Tax Reform Act of 1976, Pub. L. 94–455, 1976–3 C.B. (Vol. 1) 388, stated that the application of sections 61, 162, 174, 263, and 471 to any prepublication expenditure shall be administered without regard to Rev. Rul. 73–395 and in a manner in which such sections were applied consistently by the taxpayer to such expenditures before the date of the issuance of the revenue ruling. Section 2119 defined prepublication expenditures to mean expenditures paid or incurred by the taxpayer in connection with his trade or business of publishing for the writing,

---

his trade or business of writing." In other words, it would be limited to professional writers. [122 Cong. Rec. S5984 (daily ed. Apr. 27, 1976).]

[11]SEC. 2119. REGULATIONS RELATING TO TAX TREATMENT OF CERTAIN PREPUBLICATION EXPENDITURES OF PUBLISHERS.

(a) GENERAL RULE.—With respect to taxable years beginning on or before the date on which regulations dealing with prepublication expenditures are issued after the date of the enactment of this Act, the application of sections 61 (as it relates to cost of goods sold), 162, 174, 263, and 471 of the Internal Revenue Code of 1954 to any prepublication expenditure shall be administered—

(1) without regard to Revenue Ruling 73–395, and

(2) in the manner in which such sections were applied consistently by the taxpayer to such expenditures before the date of the issuance of such revenue ruling.

(b) REGULATIONS TO BE PROSPECTIVE ONLY.—Any regulations issued after the date of the enactment of this Act which deal with the application of sections 61 (as it relates to cost of goods sold), 162, 174, 263, and 471 of the Internal Revenue Code of 1954 to prepublication expenditures shall apply only with respect to taxable years beginning after the date on which such regulations are issued.

(c) PREPUBLICATION EXPENDITURES DEFINED.—For purposes of this section, the term "prepublication expenditures" means expenditures paid or incurred by the taxpayer (in connection with his trade or business of publishing) for the writing, editing, compiling, illustrating, designing, or other development or improvement of a book, teaching aid, or similar product.

editing, compiling, illustrating, designing, or other development or improvement of a book, teaching aid, or similar product.

Respondent argues that it is clear from the face of the statute, as well as the legislative history, that section 2119 was intended to apply not to authors, but only to publishers. We think the question is not entirely free from doubt. We note that the conference agreement followed the House bill *with necessary technical changes*, and that the section uses the personal pronoun "his" when referring to the taxpayer's trade or business of publishing. If the bill were addressing solely the corporate members of the publishing industry, the impersonal pronoun "its" would have been more appropriate. Moreover, we find the verb "publish" to be defined broadly: To prepare and issue (printed material) for public distribution or sale; to bring to the public attention; to issue a publication; and *to be the author of a published work or works*. The American Heritage Dictionary of the English Language (1976).

Additionally, section 2119 refers to "expenditures paid or incurred by the taxpayer (in connection with his trade or business of publishing) for the writing * * * of a book." Respondent, on brief, appears to argue that the expenditures of the type involved in this case would be deductible by a "publisher" which had a book written but not by a writer who had a book "published." This argument is weaker when the dictionary definition of publishing is substituted into the section. The relevant prepublication expenditures would be those paid or incurred by the taxpayer in connection with his trade or business of (1) preparing and issuing printed material for public distribution and sale, (2) bringing to the public attention, (3) issuing a publication, or (4) being the author of a published work or works, for the writing of a book.

Section 2119 was not incorporated into the Internal Revenue Code of 1954 because it was a congressional directive halting the Internal Revenue Service's application of Rev. Rul. 73–395 and ordering it to administer sections 61, 162, 174, 263, and 471 in accordance with the way, prior to the issuance of the ruling, that taxpayers had been treating prepublication expenditures until the Commissioner promulgates prospective regulations.

Respondent is not precluded from taking his present litigating position because petitioner has introduced no evidence regarding his accounting practices prior to the date Rev. Rul. 73–395 was

issued. Nonetheless, we note that Congress specifically mandated suspension of Rev. Rul. 73–395, wherein respondent announced his decision not to follow the *Stern* decision which had held prepublication expenses of an author to be deductible.[12]

From the legislative history, we infer a concern by Congress that a retroactive application of the position taken in Rev. Rul. 73–395—capitalizing all prepublication expenditures—would cause severe dislocations in the literary field. Congress expressly directed that the pertinent regulations were to be applied only prospectively. This provision, coupled with the prospective effective date of section 280, which was also a part of the Tax Reform Act of 1976, further weakens respondent's position.[13]

Section 280(a) provides that amounts attributable to the production of a book which are otherwise deductible shall be allowed as deductions only in accordance with the provisions of subsection (b).[14] Section 280(b) regulates the timing of the amounts deductible to those taxable years ending during the period during which the taxpayer reasonably may be expected to receive substantially all of the income he will receive from the book. The amount deductible for any such taxable year is the amount which bears the same ratio to the sum of all such

---

[12]The General Explanation of Tax Reform Act of 1976 prepared by the Joint Committee on Taxation explained the provision at p. 635 as follows:

"The provision allows taxpayers to treat their prepublication expenditures in the manner in which they have been treated consistently by the taxpayer in the past until new regulations are issued with regard to these expenditures after the date of enactment of this Act (October 4, 1976).

"Any regulations issued by the Internal Revenue Service after the date of enactment of this Act are to apply prospectively only to taxable years beginning after their issuance. Until these regulations are issued, the Internal Revenue Service is to administer the application of sections 61 (as it relates to cost of goods sold), 162, 174, 263 and 471 to the prepublication expenditures of publishers without regard to Revenue Ruling 73–395. In addition, as indicated above, the Service is to administer these sections in the same manner as they were consistently applied by taxpayers prior to the issuance of Revenue Ruling 73–395. If a taxpayer did not consistently follow a specific tax accounting method, his returns will be treated by the Service in accord with usual administrative procedures."

[13]Sec. 210(a), Pub. L. 94–455 (1976).

[14]Sec. 280(a) also comprehends the production costs of a film, sound recording, or similar property. The legislative history of sec. 280 indicates that it was aimed primarily at investors in motion picture tax shelters rather than producing artists. S. Rept. 94–938, 94th Cong., 2d Sess. 71–81 (1976), 1976–3 C.B. (Vol. 3) 109–119. Books appear to have been added to the bill because, as the Senate Finance Committee explained, "In addition, the committee has been informed that the production company shelter may be expanding into other areas, such as the publishing field." S. Rept. 94–938, *supra* at 76, 1976–3 C.B. (Vol. 3) at 114. The report also states: "The capitalization requirement applies to costs of producing, displaying or distributing a film * * * or other similar property, if such costs are paid or incurred after December 31, 1975, and the principal production of the property began after that date. * * * In the case of a book, principal production begins with the preparation of the material for publication." S. Rept. 94–938, *supra* at 78, 1976–3 C.B. (Vol. 3) at 116. See also S. Rept. 94–1236, 94th Cong., 2d Sess. 418–419 (1976), 1976–3 C.B. (Vol. 3) 822–823.

amounts attributable to the book as the income received from the property for that taxable year bears to the sum of the income the taxpayer may reasonably be expected to receive during such period. Section 280, as enacted, applies only to amounts paid or incurred after December 31, 1975, with respect to property the principal production of which began after December 31, 1975. Thus, although section 280 does not govern the resolution of this case (which concerns the taxable year 1974), it does show that Congress has examined the area and has enacted a specific provision addressing the capitalization issue, which took effect after December 31, 1975.[15]

As previously discussed, Congress has twice considered the capitalization question since *Commissioner v. Idaho Power Co.*, 418 U.S. 1 (1974). It enacted section 280, which requires for taxable years after December 31, 1975, the capitalization of amounts attributable to the production of a book, while suspending the revenue ruling (and its retroactive effect) that embodies much of respondent's litigating position. Not only has prior case law almost invariably allowed an individual in the trade or business of writing some current deductions, but commentators have uniformly favored such deductions or at least observed that they were often permitted in practice by respondent.

An article in Tax Law Review included the following:

Self-employed taxpayers are permitted deductions from gross income for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on their trade or business. Normally, the expenses incurred by a professional writer or artist in connection with his creative endeavors are deductible under the above rule. This usually includes a percentage of studio costs, research expenses, writing tools, etc. To be a professional in this sense does not require that writing or painting be the sole or even principal occupation of the taxpayer, but it must constitute a recurring activity which is conscientiously pursued for gain. An amateur author probably has to capitalize his expenses since they are nonrecurring and therefore non-deductible; and this would have been especially so if an amateur prior to 1950 sought capital gains treatment.

Confusion still exists as to whether certain expenditures of the artist or author, such as research expenses, are currently deductible. This is so probably because earlier rulings required that the costs of producing a copyrighted work be capitalized, which apparently included only relatively insignificant amounts, such as government copyright fees, attorney fees, etc. It is suggested, however, that the rulings in this area were particularly concerned with patents and

---

[15]We do not decide whether sec. 280 is applicable to petitioner.

inventions, and the inclusion of copyrights was almost as an afterthought. In any event, the Commissioner reputedly has been liberal in allowing professional writers and artists to deduct legitimate costs as current expenses, provided that the taxpayer has been consistent in his accounting procedures.[16]

A note in Harvard Law Review stated:

Although it is not clear how expenses incurred by amateur authors and inventors were treated before 1954, the Commissioner generally allows a professional with an established system of accounting either to deduct or to capitalize according to his normal practice as long as he was consistent.[17]

We are not saying that a producing artist must never capitalize. Certainly there may be facts and circumstances which would require capitalization in order to clearly reflect income.[18] We are simply holding that in view of the particular facts and circumstances in this case, the prior case law and the recent legislative mandates, the petitioner is entitled to deduct expenditures paid or incurred in 1974 in his trade or business of writing. Sec. 1.162–6, Income Tax Regs. See, e.g., *Wesenberg v. Commissioner*, 69 T.C. 1005 (1978).[19] We reserve until another day any opinion relating to section 280 and respondent's regulations pursuant to section 2119 of the Tax Reform Act of 1976.

To reflect the concessions of the parties and our conclusion with respect to the disputed issue,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.*, concurring: I agree with the result reached by the majority. However, I share Judge Chabot's concerns with respect to the majority's analysis of the legislative history of section 2119 of the Tax Reform Act of 1976 and the conclusions

---

[16]W. Shine, "Some Tax Problems of Authors and Artists," 13 Tax L. Rev. 439, 445–446 (1958) [fn. refs. omitted]. See also A Tax Guide for Artists and Arts Organizations 34–44 (H. Lidstone ed. 1979); T. Crawford, The Writer's Legal Guide 162–163 (1977); F. Feldman & S. Weil, Art Works: Law, Policy, Practice, 774 (1974); L. DuBoff, The Deskbook of Art Law, 641 (1977). See generally R. Beghe, "The Artist, the Art Market and the Income Tax," 29 Tax L. Rev. 491 (1974).

[17]70 Harv. L. Rev. 1419, 1422 (1957). See also P. Gitlin & W. Woodward, Tax Aspects of Patents, Copyrights and Trademarks 57 (Practising Law Institute 1960 rev.).

[18]See, e.g., A Tax Guide for Artists and Arts Organizations 19–21 (H. Lidstone ed. 1979).

[19]See also *Shields v. Commissioner*, T.C. Memo. 1978–120.

to be drawn therefrom—particularly in light of the fact that such analysis is unnecessary to the decision. My own view is that Judge Chabot's articulation of that legislative history and the impact of section 2119 is more complete and more persuasive.

NIMS, *J.*, agrees with this concurring opinion.

CHABOT, *J.*, dissenting: I agree with the majority's analysis of the judicial decisions in which the issue in the instant case has previously been discussed. However, the majority's reading of section 2119 of the Tax Reform Act of 1976 (hereinafter sometimes referred to as "section 2119, TRA76") and the legislative events preceding its enactment appear to me to be both incorrect and wholly unnecessary to the decision of this case. Accordingly, I respectfully dissent.

### 1. *Status of Revenue Rulings*

The majority seek to attack Rev. Rul. 73–395, 1973–2 C.B. 87, by creating the appearance of overwhelming congressional dissatisfaction with the ruling. This painful effort is not necessary. All that need be said about Rev. Rul. 73–395 is the familiar analysis that a revenue ruling is no more than an expression of the opinion or position of the Internal Revenue Service with respect to the law applicable to the facts recited therein and does not have the force of law. *Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971); *Browne v. Commissioner*, 73 T.C. 723 (1980), (Hall, J., concurring); *Minnis v. Commissioner*, 71 T.C. 1049, 1057 (1979), on appeal (5th Cir., June 22, 1979); *Benninghoff v. Commissioner*, 71 T.C. 216, 222 n. 4 (1978), on appeal (5th Cir., Dec. 4, 1978); *Estate of Lang v. Commissioner*, 64 T.C. 404, 406–407 (1975), on appeal (9th Cir., Jan. 6 and Jan. 19, 1976); *Anders v. Commissioner*, 48 T.C. 815, 821 (1967), revd. on other grounds 414 F.2d 1283 (10th Cir. 1969), cert. denied 396 U.S. 958 (1969); *Beck Builders, Inc. v. Commissioner*, 41 T.C. 616, 628 and n. 15 (1964).

The majority appear to have concluded that it is necessary and appropriate to give Rev. Rul. 73–395 the "honor" of being drawn and quartered, and then thrown to the sharks. Not being satisfied with the extensive—but far from exhaustive—list of cases cited above, they have determined to examine into the

legislative history of section 2119, TRA76. Unfortunately, this examination makes bad law and sets bad examples as to statutory interpretation; it does, however, illustrate the wisdom of being cautious in venturing into the realm of dictum.

### 2. *Section 2119 of the Tax Reform Act of 1976*

A. *Effect of events in the Senate.*—The provision which became section 2119, TRA76 (set forth in the majority opinion at n. 11 *supra*), appeared in the House-passed bill (H.R. 10612) as section 1306. The House-passed bill defined the operative term, "prepublication expenditures," as follows:

(c) Prepublication Expenditures Defined.—For purposes of this section, the term "prepublication expenditures" means expenditures paid or incurred by the taxpayer (in connection with his trade or business of publishing) for the writing, editing, compiling, illustrating, designing, or other development or improvement of a book, teaching aid, or similar product.

As the majority note:

(1) The report of the House Committee on Ways and Means (H. Rept. 94–658) "concerned itself exclusively with 'publishers,' and not 'writers.'" (Majority opinion at p. 857 *supra.*)

(2) Senator Ribicoff then introduced an amendment to the House-passed bill to deal with prepublication expenditures of writers, stating "Section 1306 of H.R. 10612 extends this relief only to publishers." (Majority opinion at p. 857 n. 10 *supra.*)

(3) The Senate Committee on Finance, in its report on H.R. 10612 (S. Rept. 94–938), "reiterated the substance of H. Rept. 94–658, *supra.*" (Majority opinion at p. 858 *supra.*)

(4) The Finance Committee report stated it is "appropriate to provide relief from Revenue Ruling 73–395 to authors, as well as to publishers." (Majority opinion at p. 858 *supra.*)

The majority fail to note that the Finance Committee, in its report, described its differences from the House-passed bill, as follows: "The committee amendment is substantially the same as the provision in the House bill, *except that it extends its application to authors.*" (Emphasis added.) S. Rept. 94–938, p. 405 (1976), 1976–3 C.B. (Vol. 3) 443.

The majority fail to note that the Finance Committee's reported bill would have defined "prepublication expenditures" precisely the same as in the House-passed bill, except for the addition of the words "writing or," as follows:

(c) Prepublication Expenditures Defined.—For purposes of this section, the term "prepublication expenditures" means expenditures paid or incurred by the taxpayer (in connection with his trade or business of *writing or* publishing) for the writing, editing, compiling, illustrating, designing, or other development or improvement of a book, teaching aid, or similar product. [H.R. 10612, 94th Cong., p. 815 (June 10, 1976), as reported by Senator Long; emphasis added.]

The majority fail to note that the Senate Finance Committee *withdrew* the entire provision before the Senate had an opportunity to consider the matter. See 122 Cong. Rec. S12613 (daily ed. July 27, 1976). This section of the Finance Committee's reported bill was the subject of criticism and was withdrawn after the committee held further hearings on this and several other provisions. See Staff of the Joint Comm. on Internal Revenue Taxation, Description of Provisions Listed for Further Hearings by the Comm. on Finance on July 20, 21, and 22, 1976, at 1–2, 32–34 (Comm. Print July 19, 1976); Certain Committee Amendments to H.R. 10612: Hearings before the Senate Comm. on Finance, 94th Cong., 2d Sess. 3–4, 13, 147, 310, 318, 327–328, 471–478 (1976).

What is clear, then, from the legislative history in the Senate? Firstly, the Finance Committee believed that the House-passed bill did not cover writers and that a change in statutory language was needed in order to cover writers. Secondly, the Finance Committee concluded that there was so little Senate support for any attack on Rev. Rul. 73–395 that the committee finally decided not to even present the matter to the Senate.

B. *Effect of conference action.*—The majority note (majority opinion at p. 859 *supra*) that although the conference agreement followed the House-passed bill, it did so *"with necessary technical changes"* (emphasis in original). The majority fail to note that the "necessary technical changes" included *every* change proposed by the Senate Finance Committee, *except* the change that would have added the words "writing or." They also fail to note that the conferees described the House-passed bill (which the conference agreement followed "with necessary technical changes") as follows:

*House bill.*—Under present law, IRS regulations and Revenue Ruling 73–395, 1973–2 Cum. Bull. 87, deny a current deduction for research in connection with literary, historical, or similar projects. The ruling requires that publishers' prepublication expenditures must be capitalized and may be depreciated. The House bill, which applies to all open years, allows *publishers* to continue their

customary, consistent tax accounting methods regarding prepublication expenditures without regard to Revenue Ruling 73–395 until the IRS issues new, prospective regulations. [S. Rept. 94–1236, p. 502 (1976), 1976–3 C.B. (Vol. 3) 906; emphasis added.]

The majority note (majority opinion at p. 859 *supra*) that the enacted provision uses the personal pronoun "his" rather than "its." The majority fail to note that the personal pronoun "his" was the word used in the House-passed bill, so that the use of "his" by the conferees did not change the scope of the House-passed bill. Also, there is no basis for the majority's evident assumption that every publisher subject to the Internal Revenue Code is an entity, rather than an individual.

The majority set forth (majority opinion at p. 860 *supra*) the text of two paragraphs of the General Explanation of the Tax Reform Act of 1976, in which the staff of the Joint Committee on Taxation explain the meaning of the provision. The quoted paragraphs state that section 2119, TRA 76, "allows taxpayers to treat their prepublication expenditures" in the manner described. The majority "note that Congress specifically mandated suspension of Rev. Rul. 73–395, wherein respondent announced his decision not to follow the *Stern* decision which had held prepublication expenses of an author to be deductible." (Majority opinion at p. 860 *supra*.) The majority fail to set forth the two paragraphs immediately preceding the quoted paragraphs of the Joint Committee staff explanation, as follows (pp. 634–635):

*Reasons for change*

The Congress was made aware of the *concerns of the publishing industry* as to whether Revenue Ruling 73–395, as described above, correctly interpreted the law under section 174 *as it applies to the publishing industry*. The Congress understood that historically tax accounting practices in *the publishing industry* have varied greatly and no standard procedures have been developed. *Industry members* apparently have followed their own interpretations, particularly with regard to the treatment of *publishers'* prepublication expenditures. The Congress further was informed that in the case of these expenses, some *publishers* deducted them currently while other *publishers* capitalized them. The Congress believed that in view of the uncertainty with respect to the treatment of prepublication expenditures, the Internal Revenue Service should review this treatment and issue regulations to establish a uniform treatment of such expenditures *for the entire publishing industry*. This would allow interested taxpayers an opportunity to advise the Service about the practices and problems within the industry with respect to this matter. Since the Congress was concerned about the retroactive application of Revenue Ruling 73–395 which would affect practices consistently followed by many taxpayers

for years, the Congress believed that any new rules applicable under regulations promulgated after the enactment of this Act should only have prospective application.

### Explanation of provision

The provision generally allows *publishers* to continue their customary treatment of prepublication expenditures without regard to Revenue Ruling 73–395. The prepublication expenditures affected by the provision are those paid or incurred in connection with *the taxpayer's trade or business of publishing* for the writing, editing, compiling, illustrating, designing or other development or improvement of a book, teaching aid, or similar product.
  [Emphasis added.]

What is clear, then, from the legislative history in the Conference Committee? Firstly, the conferees were aware of the Finance Committee's text and of the Finance Committee's conclusion that the House-passed bill did not include writers. Secondly, the conferees, by staying with the House-passed bill as to this point, similarly intended not to include writers.[1] Thirdly, the Congress never intended an across-the-board suspension of Rev. Rul. 73–395, but was responding to a particularized set of objections by a particular specified industry—"the publishing industry."

------

The majority have embarked upon a wholly unnecessary (1) analysis of the legislative history of section 2119, TRA76; (2) comprehensive definition of "trade or business of publishing"[2]; and (3) examination of the meaning of section 280 (majority opinion at pp. 860–861 *supra*). All of these aspects of the majority opinion are dicta; the legislative history analysis, especially, appears to be erroneous in this case and, I fear, is apt to furnish unwanted precedents for future analyses of legislative history. From this excursion of the majority, most respectfully, I dissent.

------

[1] Indeed, given the limitations as to what may be included in the report of a Conference Committee (see rule XXVIII, cl. 3, Rules of the House of Representatives (96th Cong.), H.R. Doc. No. 5–403, pp. 600–603; rule XXVII, cl. 2, Standing Rules of the Senate, S. Doc. No. 95–1, pp. 53, 239) it is not clear that the conference was permitted to restrict the Internal Revenue Service on this point to any greater extent than the House-passed bill would have restricted the Service.

[2] "The relevant prepublication expenditures would be those paid or incurred by the taxpayer in connection with his trade or business of (1) preparing and issuing printed material for public distribution and sale, (2) bringing to the public attention, (3) issuing a publication, or (4) being the author of a published work or works, for the writing of a book." [Majority opinion at p. 859 *supra*.]