ENCYCLOPAEDIA BRITANNICA, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Encyclopaedia Britannica, Inc. v. Commissioner
Docket No. 466-76.
United States Tax Court
T.C. Memo 1981-255; 1981 Tax Ct. Memo LEXIS 492; 41 T.C.M. (CCH) 1573; T.C.M. (RIA) 81255; May 26, 1981. *492 Petitioner made advance royalty payments to David-Stewart in connection with the preparation of a reference work. Petitioner currently deducted such expenditures n contravention of its long-standing policy which was to reflect editorial expenses as a component of costs of goods sold. Held, sec. 2119 of the Tax Reform Act of 1976 does not apply to allow petitioner a current deduction for such expenditures under sec. 174, I.R.C. 1954, because petitioner fails to meet the consistency requirement of sec. 2119. Held further, such expenditures are currently deductible under sec. 162, I.R.C. 1954, as an "ordinary and necessary" business expense. Faura v. Commissioner, 73 T.C. 849 (1980)(reviewed by the Court), on appeal (9th Cir. Dec. 23, 1980), followed. Dale W. Wickham, Edward O. Craft, Allen K. Halperin and Roger M. Olsen, for the petitioner. Harmon B. Dow and Charles B. Wolfe, Jr., for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, in a notice of deficiency dated October 21, 1975, determined deficiencies in income taxes due from petitioner for its taxable years ended September 30, 1966 and 1967 in the amounts of $ 2,015,299 and $ 1,130,105, *493 respectively. After various concessions and stipulations the only issue remaining for our decision is the characterization, as currently deductible or capital, of certain payments made by petitioner's F.E. Compton Division (Compton) to David-Stewart Publishing Company (David-Stewart) in respect of a work entitled "The Dictionary of Natural Sciences." FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Encyclopaedia Britannica, Inc. (petitioner), is a corporation organized under the laws of the State of New York with its principal office in Chicago, Illinois. Petitioner's Federal income tax returns for the taxable years before the Court were timely filed on a consolidated basis with its subsidiary corporations [1] *494 at Chicago, Illinois. Petitioner has been continuously engaged in the business of creating, publishing and distributing textbooks and other publications since its incorporation in 1920. Prior to 1964 Compton was a subsidiary corporation of petitioner. After 1963 Compton was a division of petitioner. During the years before us petitioner was on an accrual basis of accounting. Further, it had elected to report income from a substantial portion of its sales on the installment basis. Prior to or during its taxable year ended September 30, 1964, petitioner, *495 through Compton, entered into an agreement (Agreement) with David-Stewart in connection with the preparation of a reference work to be entitled The Dictionary of Natural Sciences (the Work or Dictionary). This Agreement was memorialized by a writing entered into between petitioner and David-Stewart and dated July 14, 1965, as supplemented on November 19, 1965. The Agreement provided in pertinent part as follows: This Agreement is made on the 14th day of July, 1965 by and between F.E. Compton Co., DIVISION OF ENCYCLOPAEDIA BRITANNICA, INC., a New York corporation with offices at 1000 North Dearborn Street, Chicago, Illinois (hereinafter called "Compton"), and DAVIDSTEWART PUBLISHING CO., [D.S.] an Illinois corporation * * *. 1. Subject to the terms and conditions of this Agreement, D.S. agrees to do all necessary research work and to prepare, edit and arrange the manuscript and all illustrative and other material for an illustrated general reference work for use in junior and senior high school courses in the natural sciences, tentatively entitled "The Dictionary of Natural Science" (hereinafter referred to as the "Work"). 4. D.S. shall handle the complete design and layout of *496 the Work subject to Compton's approval. D.S. agrees to work closely with the Editorial Staff of Compton so that the content and arrangement of the Work (and any revisions thereof) will conform to the ideas and desires of Compton and be acceptable to it. 6. D.S. shall be completely responsible for the accuracy of the contents of the Work at all stages of preparation and in its published form (including any revisions thereof prepared by D.S.). 8. Compton hereby acknowledges completion by D.S. of editorial work on volume 1. It is agreed that editorial work on volume 2 will be completed by D.S. no later than August 1, 1965, and it is further agreed that if D.S. fails to meet this requirement, Compton in its sole discretion may take whatever manuscript, artwork, photographs or other materials D.S. has prepared or that is in any state of preparation for the Work, and Compton may, but will not be obligated to, complete the Work itself or have it completed by anyone designated by Compton. * * * 9. * * * D.S. agrees that it will make every reasonable editorial and management effort to keep alterations of reproduction proofs at a minimum and that it will make any alterations required *497 by Compton or its representatives. 10. * * * D.S. warrants and agrees that the Work will be original and not in the public domain, that D.S. will be the sole proprietor thereof, and that the Work will not have been previously published in whole or in part * * *. 11. D.S. shall promptly reimburse Compton for any loss, damage or expense resulting from any claim, demand, or suit which may be asserted or brought against Compton by reason of the publication, sale or distribution of the Work, whether arising from anything contained therein, or by reason of any representation, warranty, or indemnity which Compton may make or provide to third parties respecting the content of the Work or Compton's ownership of the rights therein. D.S. at its own expense shall have the right to join Compton in the defense of any suit or action against Compton which arises in any way from the publication, sale or distribution, of the Work. 12. All right, title and interest of every kind and description in the United States and in all foreign countries, in and to the Work, all revisions thereof, and all art, manuscript and other materials prepared and furnished by D.S. in connection with the Work and *498 any revisions thereof, shall vest in Compton absolutely and without reservation. Compton's right, title and interest shall include but not be limited to all rights of copyright. At Compton's request D.S. shall execute whatever documents may be necessary to evidence Compton's complete ownership of the Work and of all revisions thereof, as well as of any and all materials prepared in connection therewith. 13. Compton shall copyright the Work in Compton's name in the United States and in such other countries as Compton deems necessary or desirable. All copyrights and renewals of copyrights shall be in the name of Compton or its designees. At Compton's request D.S. shall execute any documents which may facilitate the obtaining of copyright registrations by Compton. 14. D.S. shall have no right to sell or distribute any copy or copies of any edition of the Work or its revisions. 15. In consideration for this Agreement and D.S.'s compliance therewith, Compton agrees to pay D.S. as follows: (a) Payments to be considered as advances against future royalties: To cover
Total Am't.
Paid to date
Balance
Editorial costs
$ 69,300
$ 69,300
None
(b) Payments not considered as advances against future *499 royalties: To cover
Total Am't.
Paid to date
Balance
Preliminary
editorial costs-
$ 7,700
$ None
$ 7,700
Artwork - Actual D.S.
cost not to exceed
$ 49,702
$ 35,442.00
Open
In addition to the payments referred to in (b) above Compton shall pay D.S. a royalty on each two-volume hard-bound copy of the Work (and its revisions) sold or distributed by Compton or any of its affiliated companies * * *. 16. Until such time as D.S. has recovered all of the royalty advances made at any time by Compton, only ten cents ($ .10) of the royalty payable to D.S. on each copy of the two-volume work sold or distributed by Compton shall be remitted to D.S. in cash. The remaining amount of each such royalty shall be credited against the royalty advances made to D.S. by Compton. Prolonged negotiations with respect to the chatacter of the payments petitioner would make to David-Stewart continued until the July 1965 signing of the agreement. David-Stewart wanted as much of the payments as possible to be characterized as nonroyalty items. Petitioner, on the other hand, wished to characterize as much of the advances as prepaid royalties as possible. The more prepaid royalties petitioner paid the less petitioner would *500 pay overall because prepaid royalties were reimbursable advances. As may be seen above, petitioner was more successful and the vast majority of payments, including all those in issue before us, were characterized as advances against future royalties. According to a study undertaken by David-Stewart and described in a letter dated August 2, 1963 and included in the record, David-Stewart anticipated first year sales of the Work of approximately 175,000 to 200,000 copies. Between October 1, 1963 and June 22, 1966 petitioner paid at least 112 invoices totaling $ 184,744.60 to David-Stewart with respect to the Work. While the invoices were occasionally described as being with respect to advances against royalties and were at other times described with reference to the particular prepublication expense incurred by David-Stewart with respect to which the advance was being made, all such advances were intended by the parties to be advances against future royalties. Subsequent to July 14, 1965, it became apparent that David-Stewart could not finish the Dictionary without additional money from petitioner. On November 19, 1965, a supplemental Agreement was entered into between petitioner *501 and David-Stewart providing for additional sums, not to exceed $ 20,250, to be paid to David-Stewart as additional advances against royalties. These additional advances were to be recovered by petitioner out of future royalties earned, and in no other manner. The entire $ 20,250 in additional advance royalties was paid to David-Stewart by petitioner. Petitioner did not receive a completed manuscript of the Work from David-Stewart until 1966. In 1966 The Dictionary of Natural Sciences was published under the title "Compton's Dictionary of the Natural Sciences." This work was new and was not merely the revision of a previously published product. For its taxable year ended December 30, 1964 petitioner deducted $ 73,417 that it paid to David-Stewart in connection with the Work. Respondent audited petitioner's returns for its taxable years ended September 30, 1962, 1963 and 1964. An agent's report dated April 12, 1968 covering the audit of those years disallowed the entire $ 73,417 disbursed in the year ended September 30, 1964 on the ground that expenses incurred in producing and copyrighting a text or book represent the cost of a capital asset. The agent did not allow depreciation *502 "since the publication was not copyrighted until 1966 and was not completed or published by the taxpayer during the fiscal year ended September 30, 1964." The proposed disallowance of the $ 73,417 was an unagreed adjustment and was contested by petitioner in its protest filed with the District Director. A settlement agreement was reached in 1969 with the Appellate Division, as reflected in a Form 870-AD, pursuant to which petitioner agreed to the disallowance of the $ 73,417 and agreed to amortize this amount beginning in 1966 when sales of The Dictionary of Natural Sciences were first made. Petitioner deducted $ 44,161 and $ 10,680 on its Federal income tax returns for the taxable years ended September 30, 1965, and September 30, 1966, respectively, for disbursements made by petitioner to David-Stewart in connection with The Dictionary of Natural Sciences. Respondent audited petitioner's tax returns for those taxable years and proposed adjustments disallowing these deductions. Petitioner protested the disallowance of its deductions. On October 21, 1975, respondent mailed to petitioner a statutory notice of deficiency in which, interalia, the following adjustments for the years *503 ended September 30, 1965, September 30, 1966 and September 30, 1967, were proposed: Nature of
Tax Year Ended
Adjustment
9/30/65
9/30/66
9/30/67
Deductions for payments to
$ 44,161
$ 10,680 0
David-Stewart Publishing
Co. disallowed as capital
expenditures
Amortization or depreciation
0
(8,756)
(13,768)
allowed
Net adjustment to income
44,161
1,924 (13,768)
The above adjustments were explained as fllows: It is determined that the deductions claimed for payments to the David-Stewart Publishing Co. in the years ended 9/30/65 and 9/30/66, * * * in respect to pre-publication costs of "the Dictionary of Natural Sciences" are not allowable because said payments constitute capital expenditures. It is further determined that amortization or depreciation is allowable, in respect to payments to the David-Stewart Publishing Co. determined to constitute capital expenditures * * *. While petitioner's taxable income for its taxable year ended September 30, 1965 was increased by the notice of deficiency, no Federal income tax deficiency was asserted by respondent for that taxable year due to carryover of the petition's net operating losses from earlier years. However, the parties have stipulated that respondent's adjustments *504 to petitioner's taxable income for the year ended September 30, 1965 are in dispute and subject to review by the Court because they would increase taxable income for such year and thereby reduce the amount of net operating loss carryovers to petitioner's taxable year ended September 30, 1966. The amounts of $ 73,417, $ 44,161 and $ 10,680 disallowed by respondent in connection with The Dictionary of Natural Sciences for the taxable years ended September 30, 1964, September 30, 1965, and September 30, 1966, respectively, were disbursed by the petitioner during said years or shortly thereafter, and deducted by petitioner on its Federal income tax returns for those years respectively. In maintaining its books and records and preparing its Federal income tax returns, petitioner categorized as "editorial expenses" those expenses related to the development, preparation and maintenance of its publications, including (1) expenses which were for the production of the intellectual and physical content of the publications (fees to contributors, costs of art work, drawings and photographs), (2) expenses relating to the physical preparation of the publication (typesetting, composition and mechanical *505 work), (3) expenses for arrangement and editing of the contents (editing and editorial staff salaries), and (4) general overhead (such as salaries and rents). The expenditures under our consideration fit within the term "editorial expenses" as categorized by petitioner. Petitioner's longstanding and consistent policy was to treat editorial expenses for all publications, other than the Year Book, [2] as a "period expense" both for internal statements and tax purposes. Petitioner did not, however, currently deduct such "period expenses." With the exception of the editorial expenses relating to the Year Book, petitioner, on its consolidated Federal income tax returns, consistently reflected its editorial expenses as a component of costs of goods sold. Because petitioner utilized the installment method of accounting for a substantial portion of its sales, these editorial expenses reflected in the costs of goods sold were included in the computation of "deferred gross profit," with the result that such expenses were reflected as a reduction of income only as collected.As utilized by petitioner, the installment method of accounting had the effect of spreading editorial costs over the periods *506 in which the related sales were included in gross income. However, during the years in question, petitioner abandoned this longstanding policy with respect to the payments made by it to David-Stewart. Rather than reflecting these expenditures as a component of costs of goods sold, these expenditures were deducted currently by petitioners in the amounts of $ 44,161 and $ 10,680 for the taxable years ended 1965 and 1966, respectively. Petitioner maintained a detailed record of "advance royalties" paid to David-Stewart.As royalties became due to David-Stewart, they reduced this "advance royalty" figure as required by the formal written agreement and the supplemental agreement. As of September 30, 1967, petitioner's records showed that David-Stewart earned royalties of $ 15,267 on the sale of the Dictionary in that fiscal year. Petitioner had no income from the sale of the Dictionary during either of its taxable years 1965 or 1966. During its taxable year ended September 30, 1968, petitioner sold its rights to *507 Compton's Dictionary of the Natural Sciences to Encyclopaedia Britannica Educational Corporation for $ 81,655.27. Of the sales price, $ 26,451.91 was allocable to the sale of the prepaid royalties account and was reflected as such on petitioner's books. The expenditures made by petitioner to David-Stewart in connection with The Dictionary of Natural Sciences were paid by petitioner in connection with its trade or business of publishing. OPINION Petitioner entered into a contract with David-Stewart, a publishing company, whereby David-Stewart agreed to produce, on petitioner's behalf, a literary work to be entitled "The Dictionary of Natural Sciences." All beneficial rights and interests in this Work were to vest in petitioner. In return petitioner agreed to print and market the Work and to finance its creation by way of advances to be made to David-Stewart.The advances were to be recouped by way of offsets against the royalties David-Stewart would later earn on the sale of the book. Petitioner deducted these advance royalties in the year paid. Petitioner contends that its payments to David-Stewart (totaling $ 44,161 for the taxable year ended September 30, 1965 and $ 10,680 for *508 the taxable year ended September 30, 1966) are currently deductible because: (1) they constitute prepublication expenditures as defined in section 2119 of the Tax Rform Act of 1976 and satisfy the consistency requirements of that section; (2) they are ordinary and necessary business expenses under section 162 or are an element of cost of goods sold under established accounting principles recognized by the interpretations of sections 61, 461, and 471; (3) the expenses are research and experimental expenditures within the meaning of section 174, I.R.C. 1954, or in the alternative, if the requirements of section 174 are not satisfied, they are so closely akin to section 174 research and experimental expenditures as to warrant tax accounting treatment similar to that accorded such expenses in Rev. Proc. 69-21, 1969-2 C.B. 303; (4) to require petitioner to capitalize the expenses before us would be to require it to change its method of accounting, which respondent is not authorized to do; or (5) as otherwise allowed by law. Respondent argues that petitioner cannot be allowed these claimed deductions because section 2119 does not apply to allow current deduction of the payments before us. *509 This is true because, argues respondent, petitioner has not consistently deducted its editorial expenses as current charges against gross income as is required by the statute. Rather, continues respondent, the payments should be capitalized and amortized, either as part of the purchase price of the Work or, analogizing the payments to prepaid rent, as royalty prepayments amortizable over the life of the royalty contract. Section 2119, Tax Reform Act of 1976, Pub. L. 94-455, 90 stat. 1912, represented Congress' reaction to complaints reaching it from the publishing industry with respect to Rev. Rul. 73-395, 1973-2 C.B. 87. In Rev. Rul. 73-395, respondent addressed the issue of whether an accrual basis taxpayer in the business of creating, publishing and distributing textbooks could-- deduct, in the year incurred, all of its expenditures relative to the writing, editing, design and art work for textbooks and/or visual teaching portfolios, even though a substantial number of such books and visual aids printed may be on hand at the end of the year, on the assumption that they are research and experimental expenditures pursuant to section 174 * * *. Respondent ruled that, in his view, *510 the costs incurred by an accrual basis taxpayer in the writing, editing, design and art work directly attributable to the development of textbooks and visual aids, including therefore the type of manuscript or literary composition expenses before us, do not constitute research and experimental expenditures under section 174. Rather, respondent opined that they are capital expenditures which create an asset having a useful life extending substantially beyond the taxable year in which they are made, which cannot be inventoried but must be capitalized and amortized. [3]1973-2 C.B. at 87. See S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 441. As might be expected, the publishing industry objected to this blanket and retroactive ruling requiring capitalization of prepublication expenses regardless of any particular publisher's longstanding accounting practice. Further, the industry voiced its doubts that Rev. Rul. 73-395 correctly applied section 174. In response, Congress passed section 2119, Tex Reform Act of 1976, supra. [4] *511 *512 Section 2119 directs respondent to administer sections 61, 162, 174, 263, and 471 without regard to Rev. Rul. 73-395 and in the manner in which such sections were applied consistently by the taxpayer prior to the time that Revenue Ruling was issued. Application of section 2119 depends upon the presence of two preconditions: (1) the taxable year involved must be one beginning on or before the date on which regulations dealing with prepublication expenditures are issued after enactment of the Tax Reform Act of 1976, and (2) the expenditures in issue must be "prepublication expenditures" within the meaning of section 2119(c). The first precondition is clearly satisfied herein. For purposes of this case, respondent has conceded the second. [5] *513 Thus section 2119 applies to the payments in issue. Section 2119 is, however, a rather unique provision in the tax law in that it is primarily a directive to the Commissioner requiring that he administer sections 61, 162, 174, 263, and 471 with respect to any taxpayer without reference to his Rev. Rul. 73-395, supra, and in the manner in which those sections were consistently applied by the taxpayer to such expenditures prior to the issuance of that Revenue Ruling. See Faura v. Commissioner, 73 T.C. 849, 859 (1980) (reviewed by the Court), on appeal (9th Cir. Dec. 23, 1980). Congress did not purport to direct this or any court in any particular manner except for the inference we may glean from the statute as a whole that consistent accounting treatment of prepublication expenses should be left undisturbed until *514 prospective regulations on point are promulgated. Of course, even absent consistent treatment of any particular prepublication expenses, and even absent relevant regulations, petitioner may still show that it is entitled to deduct currently such expenditures. In any event, if petitioner could show that it accounted for the "royalties" in issue in a manner consistent with its treatment of its other editorial expenses, petitioner could argue that section 2119 mandates that it be allowed to continue this same treatment. But we do not believe that petitioner has shown that its current deduction of the advance "royalties" before us was consistent with its longstanding custom of adding its prepublication expenses to costs of goods sold. [6]
In discussing this consistency requirement, the legislative history speaks in terms of "tax accounting practices" and "tax accounting methods." H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 1029-1030. These terms are not defined in *515 this legislative history or in the Code. However, Congress, in the Internal Revenue Code of 1954, amassed a number of provisions (sections 446 to 473) under the title "Methods of Accounting" (Subtitle A, Subchapter E, Part II). These provisions deal with how and when income is to be reported and deductions are to be allowed. One such provision of the Code is section 453--Installment Method. As previously stated, petitioner utilized the installment method for a substantial portion of its sales in the years in issue. Further, petitioner's longstanding tax accounting practice was to reflect its editorial expenses in the deferred gross profit computation under section 453. However, petitioner's payments to David-Stewart were currently deducted and did not enter into the section 453 computation. Clearly the current deduction of an item will cause that item to be allocated to one period; this is not necessarily the case if that same item were added to cost of goods sold. This is most certainly not the case when gross receipts from the sale of personal property are received over a period of years and the income therefrom is reported on an installment basis. See section 1.453-1(b)(1) *516 and -2(c)(1), Income Tax Regs. A simple illustration might better bring the point home. Assume that our hypothetical corporation had gross installment sales during its tax year of $ 100, costs of goods sold (excluding prepublication expenses) of $ 50, and prepublication expenses of $ 10. Assume further that the corporation collected $ 40 of installments during the same year. The following table illustrates the effects, in a section 453 context, of (I) currently deducting an item, as opposed to (II) charging such item to cost of goods sold: I
II
Sales
$ 100
$ 100
Costs of goods sold 50 60
Gross profit
$ 50
$ 40
Gross profit percentage 50% 40%
Income per deferred gross
profit calculation
$ 20 (50% X $ 40)
$ 16 (40% X $ 40)
Prepublication expenses 10
Net income (pre-tax)
$ 10
$ 16
This example is an effective means of demonstrating the differences or inconsistencies between these two approaches. In most cases, currently deducting prepublication expenses is the more desirable approach from a taxpayer's standpoint as such treatment results in a lower currently reportable net income figure. In any event, it is not difficult to see why petitioner would choose currently to deduct its payments to David-Stewart. *517 Based on the differences illustrated above, we hold that petitioner's current deduction of "royalty" payments to David-Stewart is inconsistent with petitioner's longstanding prior accounting practice (i.e., charge to costs of goods sold). Therefore, petitioner is not entitled to the protection afforded by section 2119. We next consider petitioner's section 162 claim. Petitioner contends that its payments to David-Stewart are "ordinary and necessary" business expenses. Respondent urges that Court to hold that these payments must be capitalized because: (1) the payments were expended for the acquisition of the Work or a copyright thereon, or (2) in the alternative, the payments are attributable to the creation of the Work. Section 162 provides for the deductibility of all "ordinary and necessary" business expenses. The Supreme Court has "consistently construed the term 'necessary' as imposing only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business.'" Commissioner v. Tellier, 383 U.S. 687, 689 (1966), quoting from Welch v. Helvering, 290 U.S. 111, 113 (1933). Section 263, which takes precedence over section 162, *518 [7] provides that no deduction shall be allowed for any amount paid out for permanent improvements made to increase the value of any property. See generally Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 14 (1979). For example, amounts expended to secure a copyright and to acquire printing plates, which remain the property of the person making the payments, are capital expenditures. Section 1.263(a)-2(b), Income Tax Regs. By the same token if an item is paid in connection with the creation or acquisition of an asset having a useful life which extends substantially beyond the close of the taxable year, such expenditure may not be currently deductible or may be deductible in part and capitalizable (and amortizable) in part. Section 1.461-1(a)(2), Income Tax Regs. See Commissioner v. Idaho Power Co., 418 U.S. 1, 17 (1974).
Respondent, relying to a large degree on the Agreement, first contends that petitioner purchased the Work from David-Stewart. Respondent argues that the Agreement establishes that David-Stewart was the author and owner of the Dictionary and that all right, title and interest to the Dictionary was to *519 be conveyed to petitioner in exchange for stated consideration when the Dictionary was completed.Further, respondent continues, the advance royalty payments really amounted to a guaranteed minimum purchase price. In conclusion, respondent made a fleeting reference to the effect that the Agreement provided for the transfer of a copyright from David-Stewart to petitioner and, therefore, these payments must be capitalized pursuant to section 1.263(a)-2(b), Income Tax Regs.
Although we have carefully considered respondent's arguments and find them to be cogent and well reasoned, this issue is primarily a question of fact which must be resolved against respondent on the basis of the record herein. We believe that the Agreement clearly establishes that petitioner was paying David-Stewart for the performance of services rather than for the acquisition of an identifiable asset--the Dictionary. The very first paragraph of the Agreement establishes that petitioner was paying David-Stewart for services. In that paragraph, David-Stewart agreed to perform various services with respect to the Work (paragraph 1 of the Agreement). Such services included the preparation, editing, arrangement, *520 design and layout of the Work (paragraphs 1 and 4 of the Agreement). Paragraph 8 of the Agreement also supports a conclusion that petitioner paid David-Stewart for the performance of editorial work or services because that paragraph speaks in terms of "completion * * * of editorial work" rather than completion of the Dictionary. David-Stewart agreed to work closely with petitioner's editorial staff so that the content and arrangement of the Work conformed to the ideas and desires of petitioner. The work product resulting from David-Stewart's efforts were subject to petitioner's approval (paragraph 4 of the Agreement).Furthermore, David-Stewart was required to make any alterations to the Work that were requested by petitioner (paragraph 9 of the Agreement). David-Stewart was not undertaking independently the creation of the Work and certainly was not the dominating force associated with the Work. The agreement provided for substantial editorial supervision by petitioner. Indeed, David-Stewart's work product was to be the embodiment of petitioner's ideas and desires. David-Stewart was just the vehicle selected by petitioner to assist petitioner with the editorial phase of the *521 Work. In paragraph 12, the Agreement provides in rather broad language that petitioner owned all right, title and interest in and to the Work and "any and all materials prepared in connection therewith." Further, paragraph 8 of the Agreement provides that petitioner may take back "whatever manuscript, artwork, photographs or other materials D.S. has prepared or that is in any state of preparation" should David-Stewart not complete its editorial work by August 1, 1965. Petitioner could thereafter complete the Work if it so desired. We interpret these provisions to mean that petitioner owned and retained all right, title, and interest in and to the Work at all stages of performance by David-Stewart. Further, paragraph 13 of the Agreement provides that petitioner shall copyright the Work.It does not provide that David-Stewart shall copyright the Work or transfer any copyright to petitioner; it merely requires David-Stewart to render any assistance that petitioner may require in helping it (petitioner) to secure a copyright. We have interpreted the Agreement to vest ownership of the Work in petitioner at all stages of its completion. Therefore, David-Stewart had no property interest *522 which was subject to copyright. We note in passing that the Agreement provides that David-Stewart shall be completely responsible for the originality and the accuracy of the Work (paragraphs 10 and 11 of the Agreement). However, these provisions refer more to the quality of David-Stewart's services than to the ownership of the Work. In sum, we find that the Agreement provides that (1) petitioner paid David-Stewart for the performance of services relating to the Work, and (2) petitioner was the owner of the Work at all stages of completion. In addition, based on our evaluation of the demeanor of each witness and the credibility of his testimony, as well as our evaluation of the contents of the various exhibits, we find that the record, as a whole, supports the above findings. Accordingly, we hold that petitioner's payments to David-Stewart were not expended for the acquisition of the Work.
We now consider respondent's alternative argument that the subject payments are capital expenditures attributable to the creation of a book and as such are not deductible under section 162. The distrinction between a capital expenditure and an ordinary deduction is often difficult to draw. Commissioner v. Tellier, supra at 689; *523 Wolfsen Land & Cattle Co. v. Commissioner, supra at 13. The case before us is a particularly close one. We recognize that an argument could be made that editorial or prepublication expenses attributable to the creation of a book should be capital expenditures. On the other hand, an equally good argument can be made that the expenses before us are ordinary operating expenses of the publishing industry. We find some guidance for our resolution of this issue in section 2119, supra, and in a recently enacted section of the Code: section 280. Section 2119 carries at least the implication that in Congress's view prepublication expenses are not so clearly capital as respondent would have us believe. The Finance Committee Report accompanying the enactment of section 2119 contained the committee's view that: "Authors should be allowed to deduct as business expenses the essential, reasonable costs of earning income from their writing. Furthermore, the committee believes that it would be discriminatory to allow publishers to deduct expenses which authors must capitalize." S. Rept. 94-938 (1976), pp. 404-405, 1976-3 C.B. (Vol. 3) 442-443. In Faura v. Commissioner, supra, we allowed the deduction *524 under section 162 of an author's expenses in producing two manuscripts. To disallow the deduction of equivalent expenditures by a corporate publisher would simply reverse the discrimination feared by the Finance Committee.After all there can be no question that petitioner was in the business of creating and publishing books. We believe that the reasoning in Faura is relevant to our analysis herein. In section 280, Pub. L. 94-455, sec. 210(a), 1976-3 C.B. (Vol. 1) 20, Congress again examined this issue. [8] *525 For our purposes section 280 is important because of its rule that expenditures incurred in the production of a book, which are otherwise deductible and which are not production costs chargeable to capital account, are deductible only under the "income forecast" method described in section 280(b). The term "production costs" is not defined in the statute. In discussing the effective date of the statute, however, the Finance Committee Report, S. Rept. 94-938 (1976), p. 78, 1976-3 C.B. (Vol. 3) 116, says: The capitalization requirement applies to costs of producing, displaying or *526 distributing a film * * * or other similar property, if such costs are paid or incurred after December 31, 1975, and the principal production of the property began after that date. * * * [I]n the case of a book, principal production begins with the preparation of the material for publication * * *. [Emphasis added.] The "production costs" referred to in section 280 are similar to those under our consideration. Congress perceived a need to require deferral of the deductibility of "production costs" and enacted that section to achieve such deferral. The Finance Committee noted that no inference should be drawn that these costs were deductible prior to passage of that legislation. However, the Committee did recognize that the deductibility of certain "production costs," absent section 280, remained an unsettled issue. S. Rept. 94-938 (1976) pp. 78-79, 1976-3 C.B. (Vol. 3) 116-117. See also Faura v. Commissioner, supra, at 860. Further, Congress specifically excluded corporations from the application of section 280. In sum, Congress has specifically refused to require a corporation to capitalize expenses of the sort before us. We view the expenditures before us as nothing more *527 than the ordinary and necessary costs of carrying on business as a publisher. Based upon our decision in Faura and the implications drawn from recently enacted congressional tax legislation, we find that the deductions claimed by petitioner are described in section 162. To require capitalization in the instant case would be to require what neither the Code nor any sound theory of taxation requires: that business realities be subordinated to an overzealously applied theory of capitalization. It is a fact that the expenses before us are the normal costs of petitioner's operation as a publisher. To require capitalization would be to elevate form over substance. This we refuse to do. Having concluded that petitioner is entitled to the claimed deductions under section 162, we need not address its other theories, particularly the applicability of section 174. Cf. n. 6, supra. Decision will be entered under Rule 155. Footnotes
1. The subsidiary companies included in such consolidated returns are as follows: Encyclopaedia Britannica Press, Inc., Learning Materials, Inc., Encyclopaedia Britannica International Ltd. (formerly Encyclopaedia Britannica International, Inc.), Encyclopaedia Britannica (Austria), Ltd., Encyclopaedia Britannica (Belgium) Ltd., Encyclopaedia Britannica (Germany) Ltd., Encyclopaedia Britannica (France), Ltd., Encyclopaedia Britannica (Greece), Ltd. (Inactive), Encyclopaedia Britannica (Iberia), Ltd. (Inactive), Encyclopaedia Britannica (Italy), Ltd., Encyclopaedia Britannica (Japan), Inc., G. & C. Merriam Company, Encyclopaedia Britannica (Scandanavia), Ltd. (Inactive), Living Science Research, Inc. (Inactive), Living Science Laboratories, Inc. (Inactive), EnBrit, Inc. (Inactive), Encyclopaedia Britannica (Philippines), Inc., Britannica Schools, Inc., Britannica Home Library Service, Inc., F.E. Compton & Company, Frederick A. Praeger, Inc., Aerospace Books, Inc., and Praeger Paperbacks, Inc.
2. The Year Book is an annual publication of the Encyclopaedia Britannica covering the major events of the year.One of its functions is to update the Encyclopaedia Britannica.↩
3. Further, respondent indicated his view that the costs incurred in printing and publishing such materials were inventoriable. ↩
4. SEC. 2119. REGULATIONS RELATING TO TAX TREATMENT OF CERTAIN PREPUBLICATION EXPENDITURES OF PUBLISHERS. (a) General Rule.--With respect to taxable years beginning on or before the date on which regulations dealing with prepublication expenditures are issued after the date of the enactment of this Act, the application of sections 61 (as it relates to cost of goods sold), 162, 174, 263, and 471 of the Internal Revenue Code of 1954 to any prepublication expenditure shall be administered-- (1) without regard to Revenue Ruling 73-395, and (2) in the manner in which such sections were applied consistently by the taxpayer to such expenditures before the date of the issuance of such revenue ruling. (b) Regulations To Be Prospective Only.--Any regulations issued after the date of the enactment of this Act which deal with the application of sections 61 (as it relates to cost of goods sold), 162, 174, 263, and 471 of the Internal Revenue Code of 1954 to prepublication expenditures shall apply only with respect to taxable years beginning after the date on which such regulations are issued.
(c) Prepublication Expenditures Defined.--For purposes of this section, the term "prepublication expenditures" means expenditures paid or incurred by the taxpayer (in connection with his trade or business of publishing) for the writing, editing, compiling, illustrating, designing, or other development or improvement of a book, teaching aid, or similar product.
5. We think it obvious, from the record before us, that the payments in issue, regardless of how they were designated by the parties, were in substance prepublication "expenditures * * * incurred by the taxpayer * * * for the writing, editing, compiling, illustrating, designing, or other development or improvement of a book * * *." Clearly, had petitioner paid or incurred these expenses directly they would have been "prepublication expenditures." The fact that petitioner paid David-Stewart to perform these functions should not affect the classification of these payments as "prepublication expenditures."
6. The parties did not raise the issues of change in method of accounting under sections 446 and 481 nor of the includability in inventory under section 471↩ of the expenses at issue, and we express no opinion in these respects.
7. See Commissioner v. Idaho Power Co., 418 U.S. 1, 12↩ (1974).
8. SEC. 280. CERTAIN EXPENDITURES INCURRED IN PRODUCTION OF FILMS, BOOKS, RECORDS, OR SIMILAR PROPERTY. (a) General Rule.--Except in the case of a corporation (other than an electing small business corporation (as defined in section 1371(b)) or a personal holding company (as defined in section 542)) and except in the case of production costs which are charged to capital account, amounts attributable to the production of a film, sound recording, book, or similar property which are otherwise deductible under this chapter shall be allowed as deductions only in accordance with the provisions of subsection (b). (b) Proration of Production Cost Over Income Period.-- Amounts referred to in subsection (a) are deductible only for those taxable years ending during the period during which the taxpayer reasonably may be expected to receive substantially all of the income he will receive from any such film, sound recording, book, or similar property. The amount deductible for any such taxable year is an amount which bears the same ratio to the sum of all such amounts (attributable to such film, sound recording, book, or similar property) as the income received from the property for that taxable year bears to the sum of the income the taxpayer may reasonably be expected to receive during such period.↩